**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **SYNGENTA CROP PROTECTION AG**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UPL Ltd.**<br>**UPL Corporation Ltd.**<br>**UPL NA Inc.**<br><br>**Defendants.** | **Case No. 3:25-cv-00735** |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(3) AND 12(b)(6)**

**TABLE OF CONTENTS**

**Page**


INTRODUCTORY BACKGROUND ........ 1

STANDARD OF REVIEW ........ 2

ARGUMENT ........ 2

I. THE PATENT CLAIMS ARE JUSTICIABLE AND PLAUSIBLY ALLEGED (COUNTS I-III) ........ 2

A. Syngenta's Amended Complaint Establishes A Substantial Controversy Sufficient to Support Its Patent Claims ........ 3

1. The AC shows UPL has engaged in conduct toward Syngenta that demonstrates a substantial controversy between the parties ........ 3

2. The AC shows Syngenta has taken significant concrete steps toward a potentially infringing product ........ 5

3. UPL's threats extend to the '625 Patent, which is a continuation of the '727 Patent with an identical specification and nearly identical claims ........ 8

4. UPL cannot identify any well-founded basis for discretionary denial of jurisdiction over Syngenta's patent claims ........ 9

B. Syngenta Sufficiently Pled Inequitable Conduct For The '727 Patent ........ 11

1. Syngenta sufficiently pled materiality and intent with respect to fabricated field trial data ........ 11

2. Syngenta sufficiently pled materiality and intent with respect to the withheld Godoy reference ........ 14

C. Syngenta Sufficiently Pled Inequitable Conduct For The '625 Patent ........ 16

D. Syngenta Has Sufficiently Pled Its Invalidity Claims for the '625 Patent ........ 17

II. SYNGENTA PLEADS PLAUSIBLE SHERMAN ACT CLAIMS (COUNTS IV-VI) ........ 18

A. The AC and Evidence Sufficiently Shows Antitrust Venue for UPL NA ........ 18

B. Alleged Antitrust Markets Are Not Glaringly Deficient ........ 19

1. MF Combination Product in the United States (monopolization) ........ 20

a. UPL articulated no credible argument contrary to alleged MFC Combination product ........ 20

b. UPL's sole argument established no defect with the U.S. area ..... 22

2. MF Dithiocarbamates worldwide or alternative markets (attempted monopolization) ..... 23

a. UPL's convoluted arguments fail to show MF Dithiocarbamates (or alternative product) is facially defective ..... 23

b. UPL proved no defect with alleged worldwide (or alternative) area ..... 25

C. AC Plausibly Alleges UPL's Power In The Markets ..... 27

1. Exclusion of competition and dominant market share show UPL's U.S. MF Combination power ..... 27

2. Price control and substantial market shares show UPL's power in MF Dithiocarbamates markets ..... 28

D. The AC Alleges More Than Enough Anticompetitive Conduct by UPL ..... 30

1. Fraudulent procurement and enforcement of patents ..... 31

2. Abusive use of patents ..... 32

3. Campaign of baseless and sham patent proceedings ..... 34

4. Coercive threats/disparagement ..... 36

5. Acquisition of large competitor assets ..... 37

6. Using exclusive/restrictive contracting tactics ..... 39

E. Syngenta Alleges Plausible Standing To Sue For Antitrust Damages ..... 39

CONCLUSION ..... 40

# TABLE OF AUTHORITIES

## Cases

*Aggarao v. MOL Ship. Mgmt. Co., Ltd*., 675 F. 3d 355 (4th Cir. 2012)...................................... 18

*AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.,* No. 3:16-CV-00443, 2016 WL 3648623 (N.D. Cal. July 06, 2016)........................................................................................ 7

*Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351 (Fed. Cir. 2013)....................................... 4, 8

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed. Cir. 1988).......................... 9

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .......................................................................................... 2

*Audio MPEG, Inc. v. HP Inc.*, No. 2:15-cv-00073, 2016 WL 7010947 (E.D. Va. July 1, 2016).. 17

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................................................ 2

*Bio-Rad Lab'ys., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38 (D. Mass. 2020) ..................... 39

*BNLfood Invs. Ltd. SARL v. Martek Bio. Corp.*, No. 1:11-cv-00446, 2011 WL 6439451 (D. Md. Dec. 14, 2011) ........................................................................................ 40

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr*., 176 F. Supp. 3d 606 (W.D. La. 2016)... 38

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .............................................................. 20

*BuzzBallz, LLC v. MPL Brands NV, Inc.,* No. 24-CV-04004-EKS, 2025 WL 2052301 (N.D. Cal. July 22, 2025)........................................................................................ 9

*Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ..................................... 34, 35

*Capo, Inc. v. Dioptics Med. Prods., Inc*., 387 F.3d 1352 (Fed. Cir. 2004)............................... 9, 10

*Carefirst of Md., Inc. v. J & J*, 745 F. Supp. 3d 288 (E.D. Va. 2024) .......................................... 38

*Cascades Comput. Innovation LLC v. RPX Corp*., No. 12-CV-1143-YGR, 2013 WL 6247594 (N.D. Cal. Dec. 12, 2013) ........................................................................................ 21

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ............................................. 10

*CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333 (Fed. Cir. 2003)............................................. 13

*Chi. Pro. Sports v. NBA*, 754 F. Supp. 1336 (N.D. Ill. 1991)....................................................... 34

*Cobb Theatres III, LLC v. AMS Ent. Holdings, Inc*., 101 F. Supp. 3d 1319 (N.D. Ga. 2015) ...... 30

*Colliton v. Cravath, Swaine & Moore LLP*, No. 1:08-cv-00400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ........................................................................................ 25

*Conwood Co. v. U.S. Tobacco Co*., 290 F.3d 768 (6th Cir. 2002)................................................ 37

*Cox v. Red Hat Inc.*, No. 1:23-CV-766-DRA-WEF, 2025 WL 889888
(E.D. Va. Mar. 21, 2025)................................................................................................ 25

*Danisco U.S. Inc. v. Novozymes AS*, 744 F.3d 1325 (Fed. Cir. 2014)....................................... 3, 5

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353-54
(4th Cir. 2024)........................................................................................................ passim

*E.I. du Pont de Nemours & Co. v. Kolon Indus*., 637 F.3d 435 (4th Cir. 2011).................... passim

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.,* 273 U.S. 359 (1927).............................. 19

*Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312 (Fed. Cir. 2009)...............................11, 13

*FMC Corp. v. Manitowoc Co*., 835 F.2d 1411 (Fed. Cir. 1987)................................................. 36

*FTC v. Cephalon, Inc*., 36 F. Supp. 3d 527 (E.D. Pa. 2014)........................................................ 36

*FTC v. Facebook, Inc*., 581 F. Supp. 3d 34 (D.D.C. 2022)........................................................... 37

*FTC v. Staples,* 970 F. Supp. 1066 (D.D.C. 1997)......................................................................... 24

*FTC v. Sysco Corp*., 113 F. Supp. 3d 1 (D.D.C. 2015)................................................................. 19

*Hourani v. Mirtchev*, 943 F. Supp. 2d 159 (D.D.C. 2013)........................................................... 25

*Howard Holdings Inc. v. Life Saver Pool Fence Sys. Inc*., No. 2:23-cv-00503,
2023 WL 8530073 (D. Ariz. Dec. 8, 2023)............................................................... 31, 32

*Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344 (Fed. Cir. 2007).......................................... 32

*Ill. Tool Works, Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006)........................................................ 28

*Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195 (9th Cir. 1997).......................... 28

*In re Aggrenox Antitrust Litig*., 94 F. Supp. 3d 224 (D. Conn. 2015).................................... 21, 29

*In re Cardizem CD Antitrust Litig*., 332 F.3d 896 (6th Cir. 2003).............................................. 40

*In re Delta Dental Antitrust Litig*., 484 F. Supp. 3d 627 (N.D. Ill. 2020).................................... 26

*In re Keurig Green Mtn. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187
(S.D.N.Y. 2019)................................................................................................................ 33

*In re Loestrin 24 Fe Antitrust Litig*., 261 F. Supp. 3d 307 (D.R.I. 2017)..................................... 35

*In re Neurontin Antitrust Litig*., No. 02-1830 (FSH), 2009 WL 2751029
(D.N.J. Aug. 28, 2009)............................................................................................. 35, 36

*In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013) .................. 21

*In re Payment Card Inter. Fee &Merch. Disc. Antitrust Litig.,* 562 F. Supp. 2d 392 (E.D.N.Y. 2008) .................. 25

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117 (D. Minn. 2016) .................. 35

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015) .......... 21, 22, 27

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. 1:13-CV-00740-AJT-TRJ, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .................. 28

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) .................. 22

*J&J Sports Prods., Inc. v Mayreal II, LLC*, 849 F. Supp. 2d 586 (D. Md. 2012) .................. 24

*Jcai Inc. et al. v. Wiseleap Solutions Inc. et al.*, No. 3:23-cv-350-RCY (E.D. Va. Jan. 10, 2024) .................. 18

*K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730 (E.D.N.C. 2017) .................. 24, 27, 28

*Koch Agronomic Servs., LLC v. Eco Argo Res. LLC*, No. 1:14-CV-679, 2015 WL 5712640 (M.D.N.C. Sept. 29, 2015) .................. 21, 30

*Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559 (Fed. Cir. 1996) .................. 16

*M & M Med. Supplies & Servs. v. Pleasant Valley Hosp*., 981 F.2d 160 (4th Cir. 1992) ....... 29, 37

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) .................. 3, 5

*Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014) .................. 34

*Morton Salt Co. v. GS Suppiger Co*., 314 U.S. 488 (1942) .................. 33, 37

*Mylan Pharmaceuticals, Inc. v. Sebelius*, 856 F. Supp. 2d 196 (D.D.C. 2012) .................. 7

*N.Y. v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) .................. 21

*New Hickory Pizza, Inc. v. TIG Ins. Co*., No. 5:16-cv-00164-RLV-DSC. 2017 WL 3840278 (W.D.N.C. Sept. 1, 2017) .................. 25

*Newcal Indus., Inc. v. IKON Off. Corp*., 513 F.3d 1038 (9th Cir. 2008) .................. 30

*Nordberg, Inc. v. Telsmith, Inc*., 82 F.3d 394 (Fed. Cir. 1996) .................. 15

*Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007) .................. 40

*Ocado Innovation Ltd. v. AutoStore AS*, No. 1:21-CV-00041-JL, 2021 WL 6197076 (D.N.H. Dec. 30, 2021) .................. 15

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1 (D.D.C. 2015) ............... 40

*Palmetto Pharmaceuticals LLC v. AstraZeneca Pharmaceuticals LP*, No. 2:11–cv–00807, 2012 WL 6025756 (D.S.C. Nov. 6, 2012) ............................................................ 18

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051 (Fed. Cir. 1995) ....... 36

*PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022) ............................................. 34

*Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111 (1962) ....................................................... 9

*Regeneron Pharms., Inc. v. Merus N.V.,* 864 F.3d 1343 (Fed. Cir. 2017) .....................................11

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ........................................................................ 40

*Ridenour v. Multi-Color Corp*., 147 F. Supp. 3d 452 (E.D Va. 2015) ........................................ 37

*Sandisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007)................................. 8

*SB Diversified Prods., Inc. v. Murchison*, No. 12-CV-2328-JAH, 2014 WL 3894353 (S.D. Cal. July 28, 2014)............................................................................................ 4

*Schine Chain Theatres v. United States,* 334 U.S. 110 (1948).................................................... 31

*Sciele Pharma Inc. v. Lupin Ltd*., 684 F.3d 1253 (Fed. Cir. 2012) ............................................. 17

*SD3, LLC, v. Black & Decker (U.S.) Inc*., 801 F.3d 412 (4th Cir. 2015) ....................................... 2

*Shell Oil Co. v. Amoco Corp*., 970 F.2d 885 (Fed. Cir. 1992).................................................... 36

*Shoulder Innovations, LLC v. Ascension Orthopedics, Inc.*, No. 1:11-CV-00810, 2012 WL 2092379 (D. Del. June 8, 2012)............................................................................ 7

*Simon and Simon, PC v. Align Tech., Inc*., 533 F. Supp. 3d 904 (N.D. Cal. 2021)...................... 39

*SSS Enters., Inc. v. Nova Petroleum Suppliers, LLC*, No. 1:11-CV-1134, 2012 WL 3866490 (E.D. Va. Aug. 30, 2012).............................................................. 28

*Starr v. Sony BMG Music Ent.*, 592 F.3d 314 (2d Cir. 2010)...................................................... 37

*Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690 (4th Cir. 2021) ........................................ 40

*Telebrands Corp. v. Ragner Tech. Corp.*, No. 15-3163, 2016 WL 184423 (D.N.J. Jan. 14, 2016) ............................................................................................... 9

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992) .......................... 9

*The Hertz Corp. v. Enter. Rent-A-Car Co*., 557 F. Supp. 2d 185 (D. Mass. 2008) ...................... 31

*The Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102 (S.D. Ohio, 2011)............. 35

*Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276 (Fed. Cir. 2011) ....................... 11, 13

*Todd v. Exxon Corp*., 275 F.3d 191 (2d Cir. 2001) ............................................................ 20, 29

*United States v. Colgate & Co*., 250 U.S. 300 (1919) ............................................................ 34

*United States v. Conn. Nat'l Bank,* 418 U.S. 656 (1974)........................................................... 19

*United States v. Dentsply Int'l, Inc.,* 399 F.3d 181 (3d Cir. 2005)............................................... 27

*United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377 (1956) .......................... 20, 22, 24

*United States v. Eastman Kodak Co*., 63 F.3d 95 (2d Cir. 1995) ................................................ 25

*United States v. Grinnell Corp.,* 384 U.S. 563 (1966) .......................................................... 22, 27

*United States v. H & R Block, Inc*., 833 F. Supp. 2d 36 (D.D.C. 2011)................................. 23, 26

*United States v. LTV Corp*., No. 84-0884, 1984 WL 21973 (D.D.C. Aug. 2, 1984)..................... 24

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)...................................... 27, 28, 29

*Unverferth Mfg. Co. v. Par-Kan Co*., No. 3:13-CV-97-TLS, 2014 WL 2206922
(N.D. Ind. May 27, 2014) ........................................................................................... 12

*W.L. Gore & Assocs., Inc. v. Medtronic, Inc*.**,** 850 F.Supp.2d 630 (E.D. Va 2012)....................... 13

*Walker Process Equip., Inc. v. Food Mach. & Chem. Co.,* 382 U.S. 172 (1965) ............. 31, 35, 36

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc*., 648 F.3d 452
(6th Cir. 2011)............................................................................................................ 37

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd*., 437 F. Supp. 3d 693 (D. Minn. 2020) ............... 19

*Xitronix Corp. v. KLA-Tencor Corp.*, No. A-14-CA-1113-SS, 2015 WL 3916585
(W.D. Tex. June 25, 2015) ......................................................................................... 32

*Young v. City of Mt. Ranier*, 238 F.3d 567 (4th Cir. 2001)......................................................... 25

*Zenith Radio Corp. v. Hazeltine Rsch, Inc*., 395 U.S. 100 (1969) ............................................... 33

*ZF Meritor, LLC v. Eaton Corp*., 769 F. Supp. 2d 684 (D. Del. 2011) ........................................ 22

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................................... 2

Fed. R. Civ. P. 8(d).................................................................................................................... 26

**Regulations**

37 C.F.R. § 42.11(a) .......... 14
37 C.F.R. § 42.51(b) .......... 14

# TABLE OF ABBREVIATIONS

| Abbreviations | Definitions |
|---|---|
| AC | Amended Complaint (ECF No. 37) |
| MF Dithiocarbamates | Dithiocarbamate group of multisite fungicides product |
| MF Combination | Multisite fungicidal combination product |
| OB<br>Opening Brief | UPL's Memorandum of Law in opposition to the Motion to Dismiss and Memorandum of Law (ECF No. 44) |
| PRG | Post-grant patent review |
| PTAB | U.S. Patent Trial and Appeal Board |
| PTO | U.S. Patent and Trademark Office |
| Syngenta | SYNGENTA CROP PROTECTION AG |
| UPL | UPL Ltd., ULP Corp., and UPL NA, Inc |
| U.S. | United States |

Plaintiff ("Syngenta") respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss and Memorandum of Law (ECF No. 44, "Opening Brief," or "OB") by UPL Ltd., ULP Corp., and UPL NA, Inc. (collectively "UPL").

## INTRODUCTORY BACKGROUND

Syngenta's Amended Complaint (ECF No. 37 or "AC") plausibly alleges patent and antitrust claims. It alleges in detail how UPL used "surprising" results from faked field trials to obtain the '727 and '625 patents covering a combination of three fungicide active ingredients. AC ¶¶ 49-82. One of those ingredients is benzovindiflupyr, a patent-protected technology owned by ***Syngenta***, reflecting UPL's cynical strategy of using patents to target Syngenta and interfere with competition. *Id.* ¶¶ 15, 20, 35, 167-68. Another of the ingredients is mancozeb, a multisite fungicide made and sold by UPL without any patent protection of its own. *Id.* ¶¶ 14, 20, 35, 148.

The AC alleges how UPL wielded those fraudulent patents to help secure its dominance in two markets. *Id.* ¶¶ 85-164. It used them to threaten, launch, and extend a campaign of baseless litigation and sham proceedings to exclude competitors from commercializing the patented combination product—even threatening Syngenta with infringement for selling its own benzovindiflupyr products for use with unpatented mancozeb. *Id.* ¶¶ 21, 32-33, 169-89.[1] UPL also simultaneously exploited those patents to pursue dominance over the dithiocarbamate group of multisite fungicides, including by using patents to coerce purchases of the most popular dithiocarbamate (mancozeb) from UPL. *Id.* ¶¶ 26-30, 182-94. These tactics alone constitute clear-cut inequitable conduct and antitrust violations. Yet the AC alleges more, like UPL's outright

[1] Syngenta's benzovindiflupyr product is registered as Solatenol.® AC ¶ 37. Syngenta also makes two crop protection products containing benzovindiflupyr and another multisite fungicide, Elatus® and Mitrion™. *Id.* ¶¶ 15, 36. It would be industry practice for end-users to combine those products with mancozeb for crop application. *Id.* ¶¶ 11-13.

acquisition of its main competitor's mancozeb business to bolster its control of dithiocarbamate products. *Id.* ¶¶ 197-99. Reflecting the success of its scheme, UPL has fully excluded U.S. competition for the patented combination product, *id*. ¶¶ 33, 38, 205, and UPL has begun to reap inflated prices and profits from selling its dithiocarbamate product, i*d*. ¶¶ 206-08, all to the detriment of competition generally and Syngenta specifically. *Id.* ¶¶ 203-09.

Facing fraud and monopolization claims plausibly alleged in a 58-page complaint, UPL resorts to the usual defense playbook, implicitly drawing inferences against Syngenta, instead of for it. UPL faults the AC for not alleging claims with unnecessary levels of minutia. At the same time, UPL finely parses the allegations, instead of viewing the totality of them. UPL also relies on counsel's alternative "facts," and ignores inconvenient allegations, or mischaracterizes them. And UPL treats the applicable law in much the same way, misapplying or ignoring it as expediency demands. The Court should reject these tactics as have many others before and deny the motion.

## STANDARD OF REVIEW

UPL omits three critical motion-to-dismiss review principles. *First*, complaints need only state "a short and plain statement of the claim" to give defendant fair notice. Fed. R. Civ. P. 8(a)(2). *Second*, Rule 12(b)(6) concerns only the sufficiency of allegations, taken as true, not evidentiary support. *See SD3, LLC, v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 430-31 (4th Cir. 2015). *Third*, plaintiffs need only allege enough to allow "reasonable inference" of support for their claims. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Despite UPL urging dismissal for lack of details, Syngenta need ***not*** provide "detailed factual allegations" beyond the 58-page AC. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007).

## ARGUMENT

### I. THE PATENT CLAIMS ARE JUSTICIABLE AND PLAUSIBLY ALLEGED (COUNTS I-III)

### A. Syngenta's Amended Complaint Establishes A Substantial Controversy Sufficient to Support Its Patent Claims

UPL ignores numerous allegations in the AC and mischaracterizes others, failing to acknowledge the "totality of circumstances" as pled by Syngenta supporting a substantial controversy between the parties regarding the '727 and '625 patents. *Asia Vital Components, Co. v. Asetek Danmark*, 837 F.3d 1249, 1252-53 (Fed. Cir. 2016) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)); *Danisco U.S. Inc. v. Novozymes AS*, 744 F.3d 1325, 1331 (Fed. Cir. 2014) (emphasizing the Supreme Court's "flexible totality of the circumstances test" and its "rejection of technical brightline rules"). These allegations substantiate both UPL's threatening conduct, as well Syngenta's inability to move forward with plans to market and sell in the United States existing products that allegedly infringe the UPL patents. This substantial controversy between the parties extends not only to the '727 patent, but to the recently issued and nearly identical '625 patent as well.

#### 1. The AC shows UPL has engaged in conduct toward Syngenta that demonstrates a substantial controversy between the parties

UPL ignores numerous plausibly alleged facts regarding its threatening conduct toward Syngenta. Perhaps most fundamentally, Syngenta has alleged UPL specifically targeted Syngenta and its products in prosecuting the claims of both patents. AC ¶¶ 15, 18-20, 33, 35, 39. For example, the '727 claims expressly target "benzovindiflupyr," *id.* ¶¶ 19-20, a fungicide developed and registered by Syngenta and for which Syngenta owns intellectual property rights covering its synthesis, mixtures, formulations, and uses. *Id.* ¶ 15. Similarly, UPL prosecuted its application for the '625 continuation patent during Syngenta's post-grant review ("PGR") proceeding against the '727 patent with claims drafted by UPL to expressly and narrowly cover an upcoming Syngenta U.S. product that Syngenta identified to UPL during the parties' negotiations. *Id.* ¶ 35.

These alleged facts, completely and conveniently ignored by UPL, in conjunction with

UPL's assertions—also largely ignored—that: (i) its patent position was "strong," *id.* ¶ 21; (ii) Syngenta needed a patent license in order to have "freedom to operate," *id.* ¶ 25; (iii) Syngenta's planned U.S. sales of three-way fungicidal combinations would infringe absent a license, *id.* ¶ 33; and (iv) Syngenta must pay royalties and/or source mancozeb from UPL in order to sell its products, *id.* ¶¶ 24, 26-30, as well as its infringement action against Adama, *id.* ¶¶ 18, 21, 39, are together more than sufficient to establish a substantial controversy to support jurisdiction over Syngenta's patent claims. *See Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1357 (Fed. Cir. 2013) (holding that it is not "necessary that a patent holder make specific accusations" of infringement against the declaratory judgment plaintiff"). But the AC's allegations go further.

UPL also fails to acknowledge its prior assertions against Syngenta of copying. AC ¶ 32. As alleged in the AC, during the PGR proceeding against the '727 patent, UPL identified Syngenta's existing Mitrion™ product and repeatedly asserted the product practiced the '727 patent. *Id.* UPL even accused Syngenta of "copying" the patent through its development of Mitrion. *Id.* UPL's copying allegation reinforced Syngenta's belief that UPL would initiate suit if Syngenta were to sell its infringing product, *id.* ¶¶32-33, 38, 189, which further supports a controversy. *See SB Diversified Prods., Inc. v. Murchison*, No. 12-CV-2328-JAH, 2014 WL 3894353, at *5-*6 (S.D. Cal. July 28, 2014) (finding substantial controversy based in part on patentee's assertion that the plaintiff's product was a copy of the claimed invention).

Rather than address the "totality of the circumstances" set forth in the AC evidencing a substantial controversy between the parties, as required by Supreme Court and Federal Circuit precedent, UPL attempts to parse out a select few of the AC allegations and dismiss them individually, citing narrowly drawn case holdings. OB at 9. However, this is precisely the type of analysis rejected by the Courts, which again emphasis that "all of the circumstances" must be

considered as a whole. *MedImmune*, 549 U.S. at 127; *Danisco U.S. Inc.*, 744 F.3d at 1330 ("the question in each case is whether ***the facts alleged, under all the circumstances,*** show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (emphasis added).

UPL argues that its threats against Syngenta predate the issuance of the '727 patent (OB at 8), but those threats began after the patent had been allowed by the PTO and continued well after the patent formally issued. AC ¶¶ 19, 21-30. Moreover, the Federal Circuit has held that "pre-issuance conduct," as alleged here, can constitute an affirmative act supporting declaratory judgment jurisdiction. *Danisco U.S.*, 744 F.3d at 1331-32 (holding that a "categorical distinction between pre- and post-issuance conduct is … irreconcilable with the Supreme Court's insistence on applying a flexible totality of the circumstances test").

Finally, UPL argues that its alleged threats are "at best stale," asserting that the AC "identifies nothing" since 2023 to suggest an immediate and continuing threat. OB at 9-10. However, UPL overlooks: its subsequent repeated assertion during the 2024 PGR proceeding that Syngenta copied the '727 invention with its Mitrion product, AC ¶ 32; its amendment of the claims of the pending '625 application to specifically and narrowly target Mitrion, *id.* ¶¶ 15, 35; and the issuance of the targeted '625 patent in September 2025, just before Syngenta's filing of its original Complaint. *Id*. Thus, UPL's threatening conduct has been ongoing and continuous right up to the filing of Syngenta's Complaint and, taken together, this conduct evidences a "substantial risk" that UPL will pursue infringement against Syngenta if it launches one or more of its current products in the United States. *Danisco U.S.*, 744 F.3d at 1330.

#### 2. The AC shows Syngenta has taken significant concrete steps toward a potentially infringing product

UPL argues Syngenta's conduct does not evidence a substantial controversy supporting

declaratory judgment jurisdiction, OB at 6-8, but UPL fails to acknowledge or address Syngenta's allegations regarding its own existing and allegedly infringing products, its readiness to market and sell those products, and its inability to pursue those opportunities in light of UPL's threats. AC ¶¶ 15, 20, 29-30, 32-39. UPL selectively quotes from the AC to suggest Syngenta made its own seemingly independent "decision not to sell" or "move forward in the United States with plans to sell," OB at 6, but omits the expressly stated reasons for those decisions:

> To do so would put Syngenta at risk of UPL following through on its threats and suing Syngenta for patent infringement. The suits threatened by UPL would be costly for Syngenta to defend, would significantly disrupt Syngenta's business operations, could tarnish Syngenta's reputation in the industry and with customers, and would come with the risk of liability for damages for infringement. Based on these and related considerations, Syngenta made a reasonable and prudent decision not to sell the products, even though it has had the capability to do so successfully in a competitive market.

AC ¶ 38. While UPL repeatedly asserts Syngenta has no product, it ignores the Syngenta products identified in the AC. OB at 6-8. Again, UPL previously asserted Syngenta's Mitrion product, which Syngenta currently sells in Brazil, as infringing. AC ¶¶ 15, 29, 32. In addition, Syngenta's product Elatus®, currently marketed in the U.S., would allegedly infringe the '727 patent when combined with mancozeb. *Id.* ¶¶ 20, 38. Because of UPL's threats, Syngenta has delayed in the United States seeking to either sell Mitrion or to label Elatus for use with mancozeb. *Id.* ¶ 38.

Not only does UPL ignore these existing Syngenta products, UPL mischaracterizes other allegations to suggest EPA approval for such products would be "lengthy and uncertain." OB at 6-7. The allegations cited by UPL to support that assertion all relate to the required government permits and approvals for new entrants to manufacture and market relevant crop protection products. AC ¶¶ 154-159. Syngenta, in contrast, is an established firm, ready and able to

commercialize the products but for UPL's unlawful conduct. *Id.* ¶¶ 2, 34, 38, 210.[2] Indeed, in the case of Elatus, which Syngenta already sells in the U.S., the only EPA approval arguably needed would be a new label accompanying the product that recommends combination by the end-user with mancozeb. *Id.* ¶¶ 37-38. Elatus itself, as well as Syngenta's Solatenol® (benzovindiflupyr) product, and mancozeb are already approved for use in the United States. *Id.* ¶¶ 14, 15, 19, 37.

As further alleged in the AC, Syngenta has "the capital for investing" in its products, "industry experience, infrastructure, and relationships," "demonstrated ability to gain government and regulatory permissions and approvals," "an existing sales force and distribution network," "existing contractual relationships with distributors," and a broad and loyal base of potential customers." AC ¶¶ 34, 38; *see also id.* ¶ 37 (identifying Nutrien Ag Solutions as an existing contractual partner for Elatus). Moreover, Syngenta already sells allegedly infringing products in Brazil and the UK. *Id.* ¶ 35. UPL's arguments against a substantial controversy fail to cite any of this alleged support in the AC.[3] *See Sandisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372,

---

[2] UPL looks outside the AC for this information and cites online EPA evidence that suggests such approval could be obtained in as little as 8 months. OB at 7 n.4. This distinguishes this case from those cited by UPL (OB at 7-8) that all involved drug products, often still under development and clinical trial testing, that were subject to lengthy and uncertain FDA approval processes. *See AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.,* No. 3:16-CV-00443, 2016 WL 3648623, at *3 (N.D. Cal. July 06, 2016) (explaining five year exclusivity period for new drugs barring all other applications); *Mylan Pharmaceuticals, Inc. v. Sebelius*, 856 F. Supp. 2d 196, 201 n. 3 (D.D.C. 2012) (30 month stay before final FDA approval for ANDA applications); *but see Shoulder Innovations, LLC v. Ascension Orthopedics, Inc.*, No. 1:11-CV-00810, 2012 WL 2092379, at *3 (D. Del. June 8, 2012) (finding a justiciable controversy despite not having begun formal FDA approval).

[3] UPL asserts that Syngenta's decision not to seek a declaratory judgment of non-infringement somehow undermines the existence of a substantial controversy between the parties because it purportedly indicates the absence of a potentially infringing product. OB at 10. Again, UPL overlooks Syngenta's current Mitrion™ and Elatus products and UPL's repeated assertion that at least the Mitrion™ product is a "copy" of the '727 patent. AC ¶¶ 15, 20, 29, 32, 38. Further, there is no dispute that the '727 and '625 patents, which are directed to fungicidal combinations

1381 (Fed. Cir. 2007) (holding a "party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights").

#### 3. UPL's threats extend to the '625 Patent, which is a continuation of the '727 Patent with an identical specification and nearly identical claims

UPL's threatening conduct against Syngenta and its products extends to the related '625 patent as well. As the AC alleges, UPL's '625 patent is a continuation of the '727 patent, shares the same specification, and has claims that are directed to a particular three-fungicide combination that falls squarely within the scope of the broader '727 claims. AC ¶¶ 7, 35, 39, 78; *compare* AC, Ex. A at col. 21, ll. 40-62 ('727 claim 1) *to* AC, Ex. B at col. 22, ll. 26-30 ('625 claim 1). This overlap is not surprising given that UPL targeted the '625 claims—just as it did the '727 claims—to both incorporate Syngenta's proprietary Solatenol product as a claim element and to read directly on Syngenta's current Mitrion product. AC ¶¶ 35, 39. Thus, as targeted by UPL, Syngenta's product falls within the scope of both patents. *Id.* ¶ 20.

UPL's conduct—i.e., its ongoing threats with respect to the '727 patent (*see supra* Section I.A), along with its drafting of the recently issued '625 claims to target Syngenta based on information discussed between the parties during their negotiation—evidences a substantial risk to Syngenta with respect to the '625 patent if Syngenta were to market and sell its product in the United States. AC ¶¶ 38, 39. UPL focuses on the absence of an explicit threat tied directly to the '625 patent, OB at 10-11, but given the totality of the circumstances, the absence of an express '625-specific threat does not matter. *See Arkema*, 706 F.3d at 1357 (holding that it is not "necessary that a patent holder make specific accusations" of infringement against the declaratory judgment plaintiff"); *Telebrands Corp. v. Ragner Tech. Corp.*, No. 15-3163, 2016 WL 184423, at *4 (D.N.J.

---

consisting of three active fungicides, would cover Mitrion (as currently labeled) and Elatus (if labeled for use with mancozeb). *Id.* ¶ 20.

Jan. 14, 2016) (exercising DJ jurisdiction over a patent that had not issued at the time of the parties' discussions, where a previously asserted patent had "identical claim language").

**4. UPL cannot identify any well-founded basis for discretionary denial of jurisdiction over Syngenta's patent claims**

UPL's request that this Court decline declaratory-judgment jurisdiction over Syngenta's invalidity and inequitable conduct claims lacks the "well-founded reasons" the Supreme Court requires. *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) (citing *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)). Where a patentee has charged infringement and an actual controversy exists (as set forth above), the accused party "has the right to resolve the dispute," and declaratory actions presenting a conflict of "sufficient immediacy and reality should be allowed to proceed." *Id.* at 1355 (citing *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1526 (Fed. Cir. 1992)).

Here, the PTAB decision on appeal invalidates only the '727 patent. The possibility that the Federal Circuit may affirm the PTAB decision does not constitute a concrete, case-specific reason to deny jurisdiction. Rather, this is, at most, a speculative mootness argument for those patent claims. By avoiding imposing jurisdiction under such facts, Syngenta would be left "helpless and immobile." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988); *see also Capo*, 387 F.3d at 1355, 1358 (vacating dismissal where the dispute had "immediacy and reality" and explaining that refusal to grant declaratory jurisdiction leaves the accused party without recourse). And unlike the *BuzzBallz* case UPL relies on, here, UPL has not provided any covenant not to sue Syngenta, so the controversy is alive and well. *BuzzBallz, LLC v. MPL Brands NV, Inc.,* No. 24-CV-04004, 2025 WL 2052301, at *5 (N.D. Cal. July 22, 2025).

UPL's arguments that the Court should discretionarily deny jurisdiction over the child patent (the '625 patent) fares no better. The '625 patent is not involved in the PTAB proceeding

at all. Thus, judicial intervention would be required to apply any final decision to the child patent, which UPL does not dispute. OB at 12 n.7 (UPL stating that the ’727 patent PTAB appeal “*could* also impact its child.”) (emphasis added).

Nor does UPL’s “no harm” narrative withstand Federal Circuit precedent. Declaratory judgment jurisdiction in patent cases does not hinge on immediate commercial launch or final regulatory approval; what matters is whether the controversy is real and immediate in its effect on the parties’ conduct—including research, investment, manufacturing, supply commitments, contracting, and market planning—all of which are chilled by unresolved infringement accusations. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880-82 (Fed. Cir. 2008); *Capo*, 387 F.3d at 1355-58 (district court’s refusal to exercise jurisdiction was an abuse of discretion given the competitive impact of patent rights). UPL’s reliance on cases addressing uncertain, far-off FDA milestones is inapposite where the patentee’s enforcement posture already constrains Syngenta’s ongoing activities and business decisions.[4] Here, as addressed more fully above, Syngenta already has products poised for the U.S. market that UPL asserts are a “copy” of its patents, AC ¶¶ 15, 29, 32; has an existing salesforce, distribution network, and a significant and loyal base of customers, *id.* ¶¶ 34, 37-38; and its Elatus product, which if combined with mancozeb would allegedly infringe the UPL patents, is already on sale in the United States, *id.* ¶¶ 20, 38. Yet, UPL’s threats have prevented Syngenta from moving forward. *Id.* ¶¶ 33, 38.

This alone raises significant public interest concerns, which is bolstered by the significant evidence of inequitable conduct here. Patent rights preclude competition for the scope of their

[4] UPL’s reliance on FDA cases are inapposite for the additional reason that the time between FDA and EPA approval is vastly different. FDA approval may take up to a decade whereas EPA approval is typically measured in months. OB at 7 & n.4.

monopoly, and postponing adjudication would violate this public interest. On this record, the dispute's immediacy and reality are clear, and the absence of well-founded reasons to decline jurisdiction compels the Court to proceed.

### B. Syngenta Sufficiently Pled Inequitable Conduct For The '727 Patent

UPL's motion tries to relabel Syngenta's well-pled inequitable-conduct allegations as "speculation" and "innuendo." OB at 13. The law and the pleadings say otherwise. "[P]rior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276, 1291 (Fed. Cir. 2011) (*en banc*). However, some conduct, such as submitting a false affidavit is so egregious as to be deemed *per se* material regardless of a "but-for" showing. *Id.* at 1292-93.

Specific intent need not be proven by direct evidence; a "reasonable inference" of intent at the pleading stage suffices. *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1329 & n.5 (Fed. Cir. 2009). Indeed, "[a] court may infer intent from circumstantial evidence." *Regeneron Pharms., Inc. v. Merus N.V.,* 864 F.3d 1343, 1351 (Fed. Cir. 2017).

#### 1. Syngenta sufficiently pled materiality and intent with respect to fabricated field trial data

Syngenta's Complaint sufficiently pleads the "who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1328; *cf.* AC ¶¶ 49–82 (detailing fabricated "surprising" trial data sworn to by UPL's inventors, India registration facts, and PGR proceedings where the false data was referenced and UPL's inventors and counsel failed to correct it). Nonetheless, UPL argues that Syngenta's assertion that the data was "likely" fabricated dooms any inequitable conduct pleading, that the allegedly fabricated trial data was immaterial, and that intent is not pled. OB at 14-17. All three attacks fail.

*First*, UPL argues the field trial data allegations should be rejected as speculative because

Syngenta stated the data was "likely" fabricated. In support, UPL concocts a never-before alleged explanation, i.e., the trial *could have been conducted* in a different country such that the reference to India was an "immaterial error." OB at 14. UPL's hypothetical, for which it cites no evidence, does not defeat plausibility at the pleading stage. The AC alleges fabrication of the field trial data backed by concrete facts: (i) benzovindiflupyr was not registered for use in India during the relevant seasons; (ii) the specification's Monsoy 9144 RR soybean is not approved for use in India; (iii) there is no record of UPL obtaining regulatory approvals for the testing; and (iv) Syngenta's own trial demonstrates very different data. AC ¶¶ 57-73. Further, *four separate inventors* reviewed and affirmed the application with the cited Indian field data, AC ¶ 54, and when Syngenta requested the trial data in the PGR, UPL alleged it could not find the data—not that it was collected in a different country, *id.* ¶ 72. *Unverferth* is inapplicable as there, other reasonable inferences were available under the facts. *Unverferth Mfg. Co. v. Par-Kan Co*., No. 3:13-CV-97-TLS, 2014 WL 2206922, at *5 (N.D. Ind. May 27, 2014). Here the only *reasonable* inference is the data was fabricated in some way, not that there was a mistake on location. UPL's new and unsupported hypothesis must be rejected as something at best ripe for discovery, not Rule 12(b)(6).

*Second,* Syngenta adequately pled materiality, detailing that UPL amended its application during the October 30, 2017 PCT phase of a parent Indian application to add the purported India field-trial data that demonstrated "surprising synergy" for the allegedly novel combination sought to be patented. AC ¶ 52. UPL relied on those trial results in an April 22, 2021 response to overcome an obviousness rejection based on the De Oliveira patent, after which the rejection was withdrawn and the '727 patent eventually allowed—demonstrating materiality. AC ¶¶ 55-56.

Nonetheless, UPL argues that neither it nor the PTO relied on such data during prosecution. OB at 14-15. UPL's argument is belied by its response to the January 2021 obviousness rejection,

where UPL stated that its claims were not obvious because of "[t]he technical effects achieved by the claimed combinations, i.e., ***an enhancement of the efficacy, and a surprising reduction in fungal disease incidence when mancozeb is added to the claimed combinations***." AC ¶ 55; Ex 1, Apr. 22, 2021 Remarks at 8 (emphasis added). The USPTO then relied on the April 22, 2021 remarks in withdrawing the De Oliveira rejection. AC ¶ 56; Ex. 1, June 14, 2021 Office Action at 2, 11 (withdrawing rejection). While there were two other obviousness rejections based on the Kemmitt reference, UPL addressed that by amending the claims to use "consisting of" language. Ex 1, Apr. 22, 2021 Remarks at 6, 7, 9. Thus, unlike UPL's cited *CFMT* case, the full context of the file history here shows that the Examiner found the test data persuasive in withdrawing the De Oliveira reference. Moreover, *CFMT* addresses standards at summary judgment, not the lower standard at the pleading stage. *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1340-41 (Fed. Cir. 2003); *cf. W.L. Gore & Assocs., Inc. v. Medtronic, Inc.*, 850 F.Supp.2d 630, 633, 635-37 (E.D. Va 2012) (finding that a plaintiff only needs to allege a plausible and specific claim at the pleading stage). And although but-for materiality is pled and supported, it is unnecessary here as fabrication of trial data is egregious misconduct akin to the false-affidavit the Federal Circuit treated as per se material in *Therasense*. 649 F.3d at 1292.

*Third,* UPL's attack on Syngenta's intent pleading is undercut by *Exergen*, which establishes that pleading intent "may be averred generally," so long as the complaint includes underlying facts from which intent can be reasonably inferred. 575 F.3d at 1328-29 & n.5. That is exactly what Syngenta did. Syngenta pleads extensive details that support a reasonable inference of an intent to deceive the PTO by one or more inventors and UPL officers identified above (Messrs. Shroff), and/or by its patent counsel (Ms. LeCuyer). AC ¶¶ 53-77. The AC identifies that such intent existed when the inventors reviewed the application and signed the oath affirming its

contents on July 13, 2019, *id.* ¶ 54; Ex. 1, throughout prosecution of the patent, *id.* ¶ 55, and during the PGR where UPL avoided discovery by deceptively asserting that the data "could not be located", *id.* ¶ 72. These extensive details more than give rise to the inference of intent.

Moreover, UPL's attempt to divorce Syngenta's facts about its conduct in the PGR fails. OB at 17. Again, Syngenta does not rely on "likely" speculation but pleads concrete facts showing that, during the '727 PGR, UPL refused to clarify whether the touted "trial data" had ever existed, represented only that it "could not locate" the data, and then withdrew any reliance to avoid discovery—conduct that plausibly supports materiality and intent when coupled with the AC's allegations that the same data was used to secure allowance and later shown to be fabricated. AC ¶¶ 72-73. The PTAB's denial of discovery (AC ¶ 72) neither adjudicated deceptive intent nor absolved misconduct; discovery in PGRs is limited by rule, and the denial simply reflected UPL's belated withdrawal of reliance on the data (id. ¶ 73), not a merits finding under *Therasense*. UPL's withdrawal in order to avoid discovery is not an "objective indication of candor," as the duty of candor requires affirmative disclosure of information inconsistent with positions advanced. 37 C.F.R. § 42.11(a). Thus, the collective facts pled more than sufficiently establish intent to deceive the patent office with respect to the trial data by the inventors and/or prosecuting attorney.

### 2. Syngenta sufficiently pled materiality and intent with respect to the withheld Godoy reference

UPL's next attack is that the AC "lacks any factual basis" to attribute knowledge or intent to the two '727 inventors (Messrs. Jaidev Shroff and Vikram Shroff) or U.S. prosecution counsel (Ms. LeCuyer) with respect to the Godoy reference. OB at 16-17. UPL is incorrect and applies the wrong standard at Rule 12(b)(6) and Rule 9(b). The AC identifies the requisite facts under *Exergen* and *Therasense*, identifying the individuals, the reference, the time/place of knowledge, how it was known, and why it was material:

- **Who**: Two '727 inventors, J. Shroff and V. Shroff, and UPL's U.S. prosecution counsel, Ms. LeCuyer. AC ¶ 66.

- **What:** Godoy publication, alleged to be more material than other prior art before the examiner and later found invalidating by the PTAB. *Id.* ¶¶ 65-66.

- **When/Where**: June 27, 2019, when UPL filed a declaration in prosecution of the related Oliviera family explicitly referencing and discussing Godoy; the '727 and Oliviera applications share two inventors (J. Shroff, V. Shroff). *Id.* ¶¶ 65-66.

- **How:** Despite that knowledge, Godoy was withheld from the '727 examiner; and but-for materiality is pled, including that the PTAB later in the PGR found Godoy anticipates claims 1, 3-5, 7, and 9-10 and, with Oliviera, renders claim 2 obvious. *Id.* ¶¶ 66-67.

These well-pled facts satisfy *Exergen* and *Therasense*, and permit a reasonable inference that the identified inventors and counsel knew of Godoy and deliberately failed to disclose it.

UPL's authorities do not counsel otherwise. For example, the *Nordberg* case affirmed no inequitable conduct only after a developed record showing no knowledge by prosecution actors. *Nordberg, Inc. v. Telsmith, Inc*., 82 F.3d 394, 396-97 (Fed. Cir. 1996). It did not heighten the pleading bar and did not address allegations, as here, tying knowledge to a UPL-filed declaration explicitly discussing Godoy, overlapping inventors across the related and asserted families, and identified U.S. prosecution counsel. AC ¶¶ 66-67. And UPL's quotation from *Exergen*—that mere disclosure of a reference in one application but not a related one is not, by itself, enough—actually shows why Syngenta's pleading is sufficient. OB at 16. The AC pleads far more than the "mere fact" of disparate disclosures: it ties Godoy to a dated UPL declaration, identifies the specific individuals with knowledge, pleads non-disclosure to the '727 examiner, and alleges but-for materiality corroborated by the PTAB's later invalidity holdings. AC ¶¶ 65-67; *Exergen*, 575 F.3d at 1331. Likewise, *Ocado* is distinguishable because the pleading there lacked specific facts supporting a plausible inference of intent for the named individuals. *Ocado Innovation Ltd. v. AutoStore AS*, No. 1:21-CV-00041-JL, 2021 WL 6197076, at *5 (D.N.H. Dec. 30, 2021).

Here, Syngenta's pleading about the materiality of the Godoy reference is more than plausible. The complaint pleads that a reasonable examiner would not have allowed the '727 claims had Godoy been disclosed—further supported by the PTAB's later conclusion that Godoy itself anticipates most claims. AC ¶¶ 66-67. That is sufficient at this stage.

**C. Syngenta Sufficiently Pled Inequitable Conduct For The '625 Patent**

UPL's attack on the '625 unenforceability claim misstates the AC, which alleges with particularity that UPL reused the same fabricated "trial" data to overcome multiple rejections during the '625 prosecution, failed to disclose non-cumulative, material information—including Syngenta's PGR petition and supporting declarations that identified the fabrication, third-party critiques of UPL's Neto declaration, and the PTAB's Final Written Decision invalidating the parent '727 patent—while continuing to press a "surprising synergy" narrative that the Examiner had already criticized and only relented upon receipt of "new field trials." AC ¶¶ 78-82 (and ¶¶ 68-77 for PGR context). Those allegations easily satisfy *Exergen's* "who/what/when/where/how" and render *Therasense's* but-for materiality plausible: a reasonable examiner would not have allowed the '625 claims if informed that the relied-upon data never existed and had been expressly questioned and contradicted in the PGR record. *Id.* ¶¶ 82, 217.

UPL's reliance on *Litton* fails because Syngenta pleads withholding of different, non-cumulative materials (and inconsistent facts), not a reference "actually considered"; a passing examiner mention of the PTAB decision does not cure the applicant's duty to affirmatively disclose information inconsistent with positions advanced or to correct prior misstatements. *See Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1571 (Fed. Cir. 1996). Nor do UPL's "couldn't locate" and "withdrawal" tactics in the PGR convert its conduct into "objective good faith." At most, the tactics avoided PGR discovery, they did not purge the deception or the obligation to disclose, and they do not defeat the plausible inferences of materiality and specific intent that Syngenta alleges.

### D. Syngenta Has Sufficiently Pled Its Invalidity Claims for the ’625 Patent

UPL’s attack on Syngenta’s invalidity count ignores what the AC actually pleads and conflates Rule 8 with merits proof: Syngenta does not offer a naked recital of statutes; the AC specifically identifies prior art (Tobler) and ties that art to the ’625 patent’s claims and prosecution, while incorporating factual allegations showing that the ’625 claims were drafted to track the same subject matter as the invalidated parent and that the Examiner criticized UPL’s original “trial” data before allowance. AC ¶¶ 35, 78-82, 220-22; Ex. 2, Jan. 23, 2024 Office Action at 29-31. Rule 8 requires only a short and plain statement that renders invalidity plausible; it does not demand an element-by-element chart at the pleading stage, which is the role of later contentions. The out-of-circuit cases cited by UPL dismissed claims that simply “recite[d] various sections of the patent statute with no supporting facts”; here, by contrast, Syngenta identifies specific prior art by name (Tobler) and explains why it anticipates and/or renders obvious the ’625 claims in view of the family history and PTAB findings on the parent. *Id.* Nor does the mere fact that Tobler appeared on the PTO’s “References Cited” list defeat plausibility at the pleadings stage. OB at 19. Whether Tobler (alone or in combination) is non-cumulative and invalidating is a merits question inappropriate for Rule 12(b)(6). *See, e.g., Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) (PTO consideration of a reference does not preclude a later invalidity showing).

Likewise, UPL’s assertion that Syngenta’s Section 112 claim should be dismissed is without merit. Specifically, the statement that each claim of the ’625 patent is invalid for failure to satisfy Section 112 (AC ¶ 222) is enough to meet the pleading standard because it places UPL on fair notice, and this Court has found the more prudent approach is to address section 112 issues during claim construction, rather than through a motion to dismiss. *Audio MPEG, Inc. v. HP Inc.*, No. 2:15-cv-00073, 2016 WL 7010947, at *8 (E.D. Va. July 1, 2016). Moreover, while the EDVA

does not have local patent rules, this Court has required parties to serve Invalidity Contentions early in litigation, which "militate[] against dismissal" and "fulfill the function of [the pleading requirements under] *Iqbal* and *Twombly*." *Palmetto Pharmaceuticals LLC v. AstraZeneca Pharmaceuticals LP*, No. 2:11–cv–00807, 2012 WL 6025756, at *6 (D.S.C. Nov. 6, 2012); *see* Rule 16(b) Scheduling Order, *Jcai Inc. et al. v. Wiseleap Solutions Inc. et al.*, No. 3:23-cv-350-RCY (E.D. Va. Jan. 10, 2024), ECF No. 32 at 7-9.

## II. SYNGENTA PLEADS PLAUSIBLE SHERMAN ACT CLAIMS (COUNTS IV-VI)

UPL contests some elements of the monopolization and attempted monopolization claims,[5] but Syngenta sufficiently alleges them as shown below.

### A. The AC and Evidence Sufficiently Shows Antitrust Venue for UPL NA

UPL's rote challenge of venue for UPL NA is not useful. Syngenta need only make a *prima facie* showing of venue in response to pre-discovery challenges. *See Aggarao v. MOL Ship. Mgmt. Co., Ltd*., 675 F. 3d 355, 365 (4th Cir. 2012). Ordinarily, mere allegations of venue suffice since they are taken as true and in favor of plaintiffs, but they may also rely on affidavits and evidence. *See id*. at 365-66.

The AC expressly alleges that UPL NA transacts business in this venue, AC ¶¶ 45-48, which provides antitrust venue pursuant to 15 U.S.C. § 22. These allegations are plausible given UPL NA's location in adjacent North Carolina,[6] and its distribution and sale of crop protection products across the country. *Id.* ¶¶ 5, 12, 16, 24-30. If evidence were necessary, the Court may

[5] Monopolization is alleged by "(1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power." *E.I. du Pont de Nemours & Co. v. Kolon Indus*., 637 F.3d 435, 441 (4th Cir. 2011) (cite omitted). Attempted monopolization is alleged by "(1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success." *Id*. (cite omitted).

[6] UPL says its principal place of business is in North Carolina, OB at 39, n.23, instead of Pennsylvania as UPL NA represented in 2025 corporate filings. *See* Ex. 5.

notice publicly available government and UPL documents: UPL NA has registered with the Commonwealth ***190+ crop protection products*** for distribution and sale by UPL NA in Virginia, *see* Ex. 3, and UPL's website identifies two UPL NA representatives for its ***Virginia*** "sales territories." Ex. 4.[7] This is UPL NA transacting business in this venue. *See, e.g., Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.,* 273 U.S. 359, 374-75 (1927) (ruling defendant manufacturer "transacts business," for 15 U.S.C. § 22 venue, where it solicits orders through salesmen and promotes and ships goods).

Tellingly, UPL NA's carefully circumscribed assertions do not deny transacting business in this venue. OB at 39-40. Instead, it complains that allegations are conclusory. But the AC sufficiently pleads venue, and the evidence shows it. *See, e.g., Willis Elec. Co., Ltd. v. Polygroup Macau Ltd*., 437 F. Supp. 3d 693, 703 (D. Minn. 2020) (alleged sales and evidence of product promotion sufficient for *prima facie* showing of 15 U.S.C. § 22 venue). UPL's quibble with the allegations, in light of the evidence, is not credible, but nevertheless floating an argument is consistent with the rest of UPL's overreaching, extreme antitrust arguments.[8]

**B. Alleged Antitrust Markets Are Not Glaringly Deficient**

Antitrust markets are mere analytical tools for considering a defendant's power, consisting of a product and geographic area relevant to antitrust theories at issue. *See Kolon Indus.*, 637 F.3d at 441. Antitrust markets need not be defined with "scientific precision," *United States v. Conn. Nat'l Bank,* 418 U.S. 656, 669 (1974), and are sufficient even with "fuzziness." *FTC v. Sysco Corp*., 113 F. Supp. 3d 1, 48 (D.D.C. 2015) (quote, cite omitted). Defining markets is "a deeply

---

[7] Additionally, there is judicially noticeable evidence UPL NA is registered with the Virginia's environmental regulator for crop protection product distribution and sale across Virgina, Ex. 6 at pgs. 21, 32, 42, and UPL NA has received such products at Virginia ports. *See* Ex. 7.

[8] Syngenta respectfully requests jurisdictional discovery prior to any dismissal for lack of venue.

fact-intensive inquiry." *Todd v. Exxon Corp*., 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.). For these reasons, the Fourth Circuit explained, trial courts rarely reject alleged markets before discovery, and the rare dismissals are limited to "glaring deficiencies" like a total failure to allege any market. *Kolon Indus*., 637 F.3d at 444.

The AC is not glaringly deficient. Antitrust markets generally are defined by reasonable interchangeability, *i.e*., whether other products are reasonable substitutes,[9] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and by commercial realities, *i.e.,* how participants view markets and commercial factors bearing on how participants can realistically substitute products. =*Kolon Indus*., 637 F.3d at 442-43. Across 20 pages, the AC identifies two overall markets, supported by factual statements about interchangeability and commercial realities. AC ¶¶ 83-164.

**1. MF Combination Product in the United States (monopolization)**

Syngenta alleges that UPL monopolized the production, sale, or use of a specific mixture of fungicides—mancozeb, benzovindiflupyr, and one other fungicide ("MF Combination" product)—in the United States. AC ¶¶ 85-98, 134-46, 224, 240.

**a. UPL articulated no credible argument contrary to alleged MFC Combination product**

The AC explains why MF Combination is a product relevant to UPL's monopolization. *Id*. ¶¶ 85-98, 134-40, 224, 240. Other crop protection products, including mixtures of other fungicides, are not functionally equivalent or reasonably interchangeable. *Id*. ¶¶ 135-36. UPL admitted as much, by representing to the PTO that MF Combination achieves "enhancement of the efficiency," "surprising reduction in fungal disease resistance," and a "marked improvement"

[9] Courts also refer to "cross-elasticity of demand," *i.e*., the extent one product is interchangeable with another. *Eastman Kodak Co,* 504 U.S. at 470. Where there is interchangeability, those products are in same market; conversely, where there is not, those products are in different markets. *See United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 400 (1956).

relative to other products, *id.* ¶ 136, and by telling the PTO that other products are not equivalent. *Id.* ¶ 138. The admitted lack of alternatives for MF Combination makes it a plausible antitrust product. *See, e.g., Koch Agronomic Servs., LLC v. Eco Argo Res. LLC*, No. 1:14-CV-679, 2015 WL 5712640, at *7 (M.D.N.C. Sept. 29, 2015) (denying challenge of antitrust product when complaint alleged lack of "acceptable substitutes").

That UPL's asserted '727 and '625 patents are coextensive with MF Combination further supports its plausibility. Patents are among commercial realities that define available products and, accordingly, courts have ruled that patented products also constitute antitrust products.[10] In *In re Aggrenox Antitrust Litigation*, for instance, a patented combination of two active ingredients was a plausible antitrust product when the complaint, like the AC at ¶¶ 138-40, alleged lack of reasonable alternatives. 94 F. Supp. 3d 224, 246-47 (D. Conn. 2015). UPL simply ignored (and waived) the import of its asserted patents.

UPL's arguments, if anything, support the AC. UPL acknowledged "other products" may be "not as effective' or more costly," OB at 36—precisely why they are not substitutes. UPL's lawyer speculation about swapping active ingredients to make different combinations, OB at 36, is inappropriate for Rule 12(b)(6) motions, *see Kolon Indus.*, 637 F.3d at 449, and cannot override the AC's plausibly stating lack of reasonable MF Combination substitutes. AC ¶¶ 85-98, 134-40. UPL's sole authority, *It's My Party*, is a Rule 56 resolution on evidence and expert analysis

---

[10] *E.g., In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) (patented active ingredient, allegedly not reasonably interchangeable with others, stated antitrust product); *N.Y. v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *14-16 (S.D.N.Y. Dec. 11, 2014) (patented active ingredient "is its own market"); *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 622 (D. Md. 2015) (patents allegedly not substitutable with other products is plausible antitrust product); *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-1143-YGR, 2013 WL 6247594, at *14 (N.D. Cal. Dec. 12, 2013) (patented technology stated plausible antitrust product).

inapplicable at this stage. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682-83 (4th Cir. 2016). And grasping a stray comment in *It's My Party*, UPL erroneously argues product performance and customer preference (alleged in AC ¶¶ 136-39) should be ignored, despite their relevance to considering which products are reasonably substitutable. *See E.I. du Pont*, 351 U.S. at 404 (explaining "use and qualities" must be considered); *United States v. Grinnell Corp.,* 384 U.S. 563, 575 (1966) (considering consumer preference).

**b. UPL's sole argument established no defect with the U.S. area**

UPL agrees that geographic markets are the areas where customers can reasonably turn for supply as an alternative to dealing with defendants. OB at 32. The AC alleges exactly that, explaining the United States is an antitrust area because U.S. customers of MF Combination cannot reasonably turn outside the country. AC ¶¶ 141-46, 240-41. This suffices because, if a complaint alleges "U.S. consumers can predictably turn to supplies only in the United States, then the United States is the relevant geographic market." *Kolon Indus*., 637 F.3d at 439.

The AC, however, also explains (and UPL ignored) that laws and regulations are barriers to U.S. customers turning to foreign supplies, AC ¶¶ 142-45, "commercial realities" further defining markets. *Kolon Indus*., 637 F.3d at 442-43. Importantly, UPL's asserted patents preclude purchase or use of MF Combination in the United States from suppliers other than UPL, AC ¶ 146, eliminating other suppliers, wherever located, as alternatives, *id.* ¶¶ 19-21, 33, 38, 146, 189, and limiting the market to the United States. *See ZF Meritor, LLC v. Eaton Corp*., 769 F. Supp. 2d 684, 697 (D. Del. 2011) (relying on "patent protection" for market); *Intell. Ventures I,* 99 F. Supp. 3d at 622 (ruling United States is plausible area for challenge of U.S. patents).

UPL's sole argument—an assertion that U.S. market for MF Combination is inconsistent with alleged worldwide market for different products—distorts the AC. OB at 36. It ignores that those different products are ***not*** allegedly restricted by U.S. patents, AC ¶¶ 3, 14, 190-94, and rests

on unexplained lawyer "facts" to presume erroneously that ***different*** products must always inhabit the ***same*** geographic area. *See Kolon Indus*., 637 F.3d at 449 (reversing dismissal that relied on alternative "facts"). The AC explains why that is not so, AC ¶¶ 126-33, 141-46, and UPL raises a premature summary judgment argument at best.

#### 2. MF Dithiocarbamates worldwide or alternative markets (attempted monopolization)

Syngenta alleges that UPL is attempting to monopolize the production and upstream sales of dithiocarbamate group multisite fungicides ("MF Dithiocaramates" product) worldwide, AC ¶¶ 85-133, 232, or alternatively MF Dithiocarbamates and chloronitrile group multisite fungicides ("MF Chloronitriles" product), worldwide, in United States and/or Brazil. *Id.* ¶¶ 125 131-33, 232.

##### a. UPL's convoluted arguments fail to show MF Dithiocarbamates (or alternative product) is facially defective

UPL does not contest that multisite fungicides offer end-users significant, distinct crop protection benefits. Such characteristics, the AC meticulously explains, make a group of multisite fungicides—MF Dithiocarbamates—not practicably interchangeable with other products for a variety of common crop protection purposes. *Id.* ¶¶ 85-123, 232. This is consistent with UPL's own admissions and well-established market definition principles, including:

- UPL's pre-litigation documents admitted that the most prevalently used of MF Dithiocarbamates, mancozeb,[11] is "***vital***" and "***crucial***" for crop protection, and there is ***no "solution"*** other than using them. AC ¶¶ 114-15, 117-18. UPL's acknowledged lack of reasonable alternatives strongly supports the AC. *See United States v. H & R Block, Inc*., 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("courts often pay close attention to the defendants' ordinary course of business documents" for market definition).
- End use-use customers acknowledge that MF Dithiocarbamates are "***unique, irreplaceable, essential, and of critical importance***" for crop protection. AC ¶¶ 120-

[11] The AC properly considers mancozeb as representative of the dithiocarbamate group multisite fungicides, because mancozeb makes up the vast majority of group sales, AC ¶101, and antitrust markets need not be alleged with precision. *See Sysco*, 113 F. Supp. 3d at 51 (ruling alleged market capturing 75% of business was sufficient given markets "need not be defined 'by metes and bounds'") (cite omitted).

21. Their recognized lack of substitution is persuasive because participants "usually have accurate perceptions" of their markets. *FTC v. Staples,* 970 F. Supp. 1066, 1079 (D.D.C. 1997) (quote, cite omitted).

- ***Governments restrict availability or use*** of even close substitutes for MF Dithiocarbamates, including many countries banning, or considering bans of other fungicides. AC ¶¶ 111-12. Such regulations limiting available substitutes help define antitrust markets. *See United States v. LTV Corp*., No. 84-0884, 1984 WL 21973, at *14 (D.D.C. Aug. 2, 1984) (noting regulations affect contours of market).

Based on these and additional facts, Syngenta plausibly alleges that MF Dithiocarbamates is an antitrust product, AC ¶¶ 123-25, because other products are not reasonable, functional, economic substitutes. *See K-Flex, Inc. v. Armacell, Inc*., 299 F. Supp. 3d 730, 734 (E.D.N.C. 2017) (ruling alleged lack of substitutes sufficiently stated antitrust product). Alternatively, Syngenta alleges that MF Chloronitriles should be included with MF Dithiocarbamates because, in a competitive market, other products would not be sufficiently interchangeable to restrain a firm from controlling prices for both MF Dithiocarbamates and MF Chloronitriles, AC ¶ 125, which would show them as an antitrust product. *See E.I. du Pont*, 351 U.S. at 400 (considering cross-elasticities of demand).

Ignoring those dispositive allegations, UPL asserted three specious arguments. *First,* it misrepresents the AC as "admitting" that "single-site" and "inorganic groups" are interchangeable with MF Dithiocarbamates. OB at 30. But the AC actually explains why they are ***not*** interchangeable. AC ¶¶ 89-96, 110 ("single-sites" not substitutes); *id.* ¶¶ 105-09, 115-23 ("inorganics" not substitutes). UPL's sole cited case is plainly inapt. OB at 30 (citing *American Online's* consideration of complaint, unlike here, lacking interchangeability allegations).

*Second*, MF Dithiocarbamates is not an "implausible" product simply because the AC alternatively pleads it could include MF Chloronitriles. OB at 31. Rule 8(d) permits alternative pleading and "inconsistency" is not grounds for dismissal. *J&J Sports Prods., Inc. v Mayreal II, LLC*, 849 F. Supp. 2d 586, 589 (D. Md. 2012). Similarly, the presumption that Syngenta is bound to a market theory in its initial Complaint is contrary to the Fourth Circuit's "general rule" that

amended pleadings supersede originals, rendering them of "***no legal effect***." *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (emphasis added). UPL proved no extreme reasons necessary for deviating from that rule. *See New Hickory Pizza, Inc. v. TIG Ins. Co*., No. 5:16-cv-00164-RLV-DSC. 2017 WL 3840278, at *5-6 (W.D.N.C. Sept. 1, 2017) (explaining superseded pleadings may be considered in extreme circumstances like bad faith).[12]

*Third*, UPL's argument that the AC alleges only customer "preferences" is doubly wrong. OB at 31. UPL erroneously presumes that preferences are improperly considered. *See supra* Section II.B.1.a.; *In re Payment Card Inter. Fee &Merch. Disc. Antitrust Litig.,* 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008) (explaining market definition "depends on information about consumer behavior and perceptions"). UPL also incorrectly presumes that the AC alleges only preferences—when it actually describes substitution in the context of commercial effectiveness, costs, and prices, AC ¶¶ 92-93, 105-11, 115-18, 120-23, in concluding that MF Dithiocarbamates (and alternatively MF Chloronitriles) are not reasonably interchangeable with other products.

**b. UPL proved no defect with alleged worldwide (or alternative) area**

The AC explains why worldwide is an area relevant to UPL's attempted monopolization. AC ¶¶ 126-33, 232-33. It alleges that multisite fungicide products are produced on multiple continents, *id*. ¶ 128, and they can be transported worldwide and used in any country that permits them, *id*. ¶ 127, consistent with a worldwide area where suppliers operate and customers can turn. *See, e.g., United States v. Eastman Kodak Co*., 63 F.3d 95, 105 (2d Cir. 1995). And the AC alleges

---

[12] This is consistent with UPL's unreported case, *Cox*, where plaintiff "conceded" it was bound to a prior pleading. *Cox v. Red Hat Inc.*, No. 1:23-CV-766-DRA-WEF, 2025 WL 889888, at *11, n.11 (E.D. Va. Mar. 21, 2025). Both cases cited by *Cox* involved bad faith. *See Colliton v. Cravath, Swaine & Moore LLP*, No. 1:08-cv-00400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (Rule 11 violation); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171-72 (D.D.C. 2013) (dismissing case instead of imposing Rule 11 sanctions).

that industry participants—including UPL—organize and operate their businesses in recognition of a worldwide market, AC ¶ 127, further supporting such a market. *See H & R Block,* 833 F. Supp. 2d at 52. For these and additional reasons, the AC alleges a plausible worldwide market, AC ¶130, because MF Dithiocarbamate customers in a competitive market would respond to price increases by turning to alternative suppliers in other countries. *See Kolon Indus*., 637 F.3d at 441-43 (affirming geographic market allegations like the AC's suffice).

Alternatively, the AC alleges the United States and/or Brazil may be relevant areas, based on country-specific regulations restricting sales and use, and differing prices, for multisite fungicide products, including MF Dithiocarbamates, which practically limit customers from turning outside the United States and Brazil for alternative supplies. AC ¶¶ 131-33. These commercial realities make plausible those countries as alternative areas relevant to UPL's power—which need not be confirmed prior to discovery. *See In re Delta Dental Antitrust Litig*., 484 F. Supp. 3d 627, 641 (N.D. Ill. 2020) (denying motion to dismiss alternatively pled markets, noting plaintiffs could "develop the record to define more precisely the geographic market").

In response, UPL repeats the flimsy argument that a worldwide area for MF Dithiocarbamates is "inconsistent" with a U.S. area for the MF Combination product, OB at 32—while ignoring, again, the alleged product differences, including there is no alleged U.S. patent restricting MF Dithiocarbamate sale and use to the United States. *See supra*, Section II.B.1.b. UPL's repetitious argument that a worldwide argument is inconsistent with alternative U.S. and/Brazil markets also ignores that alternative pleadings are permitted, *see* Fed. R. Civ. P. 8(d), especially for inherently fact discovery dependent market allegations.

The overarching accusation that Syngenta improperly "gerrymander[ed]" markets is wrong. OB at 37. It explains in detail why alleged products are not reasonably interchangeable

with others in the alleged areas. AC ¶¶ 83-146. This sufficiently pleads lack of alternatives, *see K-Flex*, 299 F. Supp. 3d at 734 (complaint alleging lack of substitutes for relevant product is "sufficient to go forward"), clearing low threshold for pleading markets. *See Kolon Indus*., 637 F.3d at 447 (explaining complaints need only plead "plausible reasons for limiting" markets).

### C. AC Plausibly Alleges UPL's Power In The Markets

UPL's power in the markets can be pled by alleging it (i) controls prices or (ii) excludes competition. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (*en banc*). Power also is inferred from dominant share of market protected by entry barriers. *See Grinnell,* 384 U.S. at 571. The AC plausibly alleges all three.

#### 1. Exclusion of competition and dominant market share show UPL's U.S. MF Combination power

UPL did not contest that Syngenta plausibly alleges UPL's power through its exclusion of competition. AC ¶ 162. Its exclusionary actions run throughout the AC, including UPL exploiting its unlawful patents, threatening competitors, and using its control over the U.S. MF Combination product to impose exclusive and restrictive purchase conditions, *id.* ¶¶ 19, 21, 25-31, 39, 165-74, 184-87, 195-96, which coerced at least one competitor (Syngenta) from competing and killed competition in the market. *Id.* ¶¶ 33-39, 175-76, 184. UPL's alleged ability to exclude competition shows power sufficient to withstand dismissal. *See, e.g., Intell. Ventures I,* 99 F. Supp. 3d at 625 (ruling patents covering alleged market plausibly states power because "essence of a patent grant is the right to exclude others"); *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 189-91 (3d Cir. 2005); (threats and retaliation shows "supremacy" in market).

Syngenta also plausibly alleges power based on UPL's dominant share protected by entry barriers. *See Grinnell,* 384 U.S. at 571. Alleged market shares of 50-70% suffice for monopolization. *See Kolon Indus.*, 637 F.3d at 450. The AC alleges far more: UPL "controls about

100%" of U.S. MF Combination market. AC ¶ 161. The AC also alleges well-recognized entry barriers, *id*. ¶¶ 154-64, all ignored by UPL. *See Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common entry barriers include: patents or other legal licenses … high capital entry costs…."); *Microsoft*, 253 F.3d at 51 (identifying "regulatory requirements" as barriers). UPL's alleged "100%" share, protected by these barriers, plausibly alleges monopoly power. *See K-Flex*, 299 F. Supp. 3d at 735 (alleged 70% share suffices).

Neither of UPL's off-point arguments make its alleged power implausible. Its assertion that patents cannot "substitute for market power," OB at 37, n.22, exaggerates the law. It does not prohibit patents from conferring power; it requires only that power be shown by reference to market circumstances—as done by the AC at ¶¶ 154-64. *See Ill. Tool Works, Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 45-46 (2006). UPL's unsupported argument that it cannot have power because it supposedly sells no MF Combination product conflates the ability to exclude with sales. OB at 37. UPL's exclusion of competition from the market shows its power, and UPL cited no authority for disregarding that power merely because UPL succeeded in excluding all its competitors.[13] Moreover, UPL's proposition, if recognized, would permit it to exclude rivals in manners incompatible with § 2's purpose "to safeguard the competitive process." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353-54 (4th Cir. 2024).

### 2. Price control and substantial market shares show UPL's power in MF Dithiocarbamates markets

[13] Neither of UPL's unreported cases address, let alone support, the proposition that a firm cannot have power in market when it has successfully excluded or itself withheld all sales. On summary judgment, *SSS Enterprises* dismissed claims for failure to prove antitrust markets. *SSS Enters., Inc. v. Nova Petroleum Suppliers, LLC*, No. 1:11-CV-1134, 2012 WL 3866490, at *2 (E.D. Va. Aug. 30, 2012). *Intellectual Ventures* dismissed claims when plaintiff alleged no control of prices, or reduction of output, or market shares indicative of power. *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. 1:13-CV-00740, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013).

UPL did not contest the AC's allegation of UPL's control of MF Dithiocarmamate prices, AC ¶ 150, 206-07, a "strong indicator" of UPL's power. *Todd*, 275 F.3d at 206. UPL's ability to charge supra-competitive prices and collect inflated profit margins, relative to other crop protection products, *id.* ¶¶ 150, 206-07, plausibly shows UPL's power over MF Dithiocarbamates. *See In re Aggrenox Antitrust Litig*., 94 F. Supp. 3d at 247 (ruling alleged ability to charge supra-competitive prices makes alleged power "highly plausible").

Although not needed, Syngenta also alleges power inferred from UPL's substantial share protected by entry barriers. *See Microsoft*, 253 F.3d at 51. The AC alleges UPL controls about 50% of the production and 40% of sales worldwide for MF Dithiocarbamates, and about 50% and 60% of the sales in alternatively alleged United States and Brazil, respectively. AC ¶¶ 148, 151. The AC also alleges substantial barriers that limit competition. *Id*. ¶¶ 154-64. These shares, protected by barriers, suffice for plausibly implying UPL's power sufficient for attempted monopolization. *See M & M Med. Supplies & Servs. v. Pleasant Valley Hosp*., 981 F.2d 160, 168 (4th Cir. 1992) (explaining shares between 30-50% suffice for certain markets, and more than 50% is treated as attempted monopolization).[14]

Instead of engaging with the actual market share allegations, UPL creates confusion by misconstruing the AC as positing a blend of different markets, *i.e*., separate markets for production and sales, OB at 33—when the AC is simply referring to products that UPL makes and sells. AC ¶ 85. UPL's skewed "recalculation" of its alleged shares, while unclear, evidently distorts AC terms "at least" and "more than" to be absolute maximums and minimums, OB at 33, n.19—which

---

[14] A share of less than 50% would plausibly support attempted monopolization here because, as the AC alleges at ¶¶ 149, 151-64, 197-200, UPL recently increased its share by acquiring Corteva assets, UPL's share is expected to increase due to regulation changes, and UPL is especially dominant in key cash crop markets. *See M & M Med*., 981 F.2d at 168 (explaining rising shares, exclusionary acts, and entry barriers reduce needed market shares).

is why courts disregard such defendant-generated biased recalculations. *See Cobb Theatres III, LLC v. AMS Ent. Holdings, Inc.*, 101 F. Supp. 3d 1319, 1340 (N.D. Ga. 2015).

Creating more confusion, UPL complains that the AC does not state market shares for "downstream" sales and price elasticities in the United States or Brazil, OB at 34-35, when the alleged product is upstream sales, and the AC alleges UPL's sufficient 50-60% shares of them. AC ¶¶ 85, 151. Regardless, complaints need not allege the sort of peripheral market detail UPL nitpicks. *E.g., Koch Agronomic,* 2015 WL 5712640, at * 7 (denying motion even when alleged market lacked detail on substitutes). This is illustrated by UPL's inapt cases that dismissed complaints not for lack of detail, but because they had ***no allegations*** or no explanation of power. OB at 33-35 (citing *SSS Enterprise* and *Intell. Ventures*). In contrast, the AC alleges pages of facts; there is no glaring defect with its explanation; and the power issues UPL raise are for discovery at best. *See Newcal Indus., Inc. v. IKON Off. Corp.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (explaining market power ordinarily is not revolved pre-discovery).

### D. The AC Alleges More Than Enough Anticompetitive Conduct by UPL

In monopolization context, conduct taken "to 'exclude rivals on some basis other than efficiency'" can be anticompetitive. *Duke Energy*, 111 F.4th at 353 (cite omitted). Syngenta alleges UPL's monopolization by a course of intertwined conduct, including patent fraud, exploiting and broadening patents, misusing a campaign of litigation, acquiring and eliminating a competitor, and threatening customers and disparaging competitors. AC ¶¶ 165-202, 233, 241.

UPL's entire argument is defective for ignoring the ***totality*** of its conduct and instead subdividing it for analysis in *seriatim* categories. OB at 21-29. This parsing tactic is contrary to the allegations. AC ¶ 165 (alleging UPL's tactics are "related and self-reinforcing"). It also violates the Fourth Circuit's crystal-clear rule for course of related conduct: "It is foundational that alleged anticompetitive conduct must be considered as a whole…. [A] firm's exclusionary efforts [must]

be considered in their totality." *Duke Energy*, 111 F.4th at 354-55.

Still worse, UPL erroneously presumes that only "cognizable" or ***unlawful*** conduct can be anticompetitive. OB at 21-29. This contravenes the Supreme Court's instruction, "Even an otherwise lawful device may be used as a weapon … in an effort to monopolize." *Schine Chain Theatres v. United States,* 334 U.S. 110, 119 (1948); *see also Duke Energy*, 111 F.4th at 354-55 (explaining anticompetitive conduct is comes in "myriad" forms and cannot be "categorized").

Syngenta addresses anticompetitive conduct below, following UPL's *seriatim* categorization for the Court's convenience, despite instruction to assess conduct in totality. *See id*.

**1. Fraudulent procurement and enforcement of patents**

Enforcement of a fraudulently procured patent is inherently anticompetitive because patents exclude competition. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Co.,* 382 U.S. 172, 174, 177 (1965) (explaining enforcement of fraudulent patent, on its own, can support monopolization claim). The AC plausibly alleges both fraudulent procurement and enforcement.

The AC alleges UPL's use of fabricated data and other fraudulent acts to procure the '727 and '625 patents, as part of its strategy of pursuing patents for unpatentable products to thwart competition. AC ¶¶ 166-69. The AC identifies individuals involved, *id.* ¶¶ 54-55, 66, 76, 78-79, describes their conduct, *id*. ¶¶ 52-55, 54, 65-68, 70-82, and states why it is fraudulent. *Id*. ¶¶ 57-64, 67-74. These allegations sufficiently state fraudulent procurement. *E.g., The Hertz Corp. v. Enter. Rent-A-Car Co*., 557 F. Supp. 2d 185, 194 (D. Mass. 2008) (denying motion to dismiss claim that identified individuals and described fraudulent conduct).

The AC also alleges enforcement. It is not limited to infringement litigation or "express" threats; rather, it is implied from the "totality of the circumstances" that a patent holder might take such action in the future. *Howard Holdings Inc. v. Life Saver Pool Fence Sys. Inc*., No. 2:23-cv-00503, 2023 WL 8530073, at *4-5, *7 (D. Ariz. Dec. 8, 2023). These circumstances are alleged

multiple ways, including: UPL has a corporate strategy of using patents to constrain competitor technology, AC ¶¶ 167-69 (demonstrated by UPL's '727 patent that combines Syngenta's patented active ingredient with unpatented products like mancozeb); UPL claimed its '727 patent is "strong," and Syngenta needed a license and had to pay royalties, *id*. ¶¶ 21-25, 171; in exchange for "freedom to operate," which presumes patent protection, UPL demanded that Syngenta purchase mancozeb from UPL, *id*. ¶¶ 26-29; UPL sued Adama for infringement of patent related to the '727 patent, *id*. ¶ 18; UPL accused Syngenta products of "copying" the '727 invention, *id*. ¶ 32;[15] and reflecting concern that UPL would sue, Syngenta initiated a patent review (PRG) and abstained from commercializing infringing products. *Id*. ¶¶ 22, 33-38.

These allegations collectively state a justifiable belief that UPL would enforce the '727 and/or '625 patents, *id*. ¶ 39, confirmed by courts finding even lesser allegations sufficient. For instance, in *Xitronix Corp. v. KLA-Tencor Corp.*, the court found sufficient defendant's enforcement of a different patent (like UPL's suit against Adama), when the at-issue patent was used to "capture" competitor technology (like UPL's '727 and '625 patents). No. A-14-CA-1113-SS, 2015 WL 3916585, at *3, *6 (W.D. Tex. June 25, 2015); *see also Howard Holdings*, 2023 WL 8530073, at *5, *7 (finding plausible enforcement when defendant allegedly told plaintiff's customers it "admitted" to infringement and "discouraged" them from business with plaintiff).

UPL mustered no reason to rule otherwise. OB at 22. Its assertion that "[m]ere procurement" is not unlawful simply disregards the alleged ***enforcement*** of ***fraudulent*** patents. UPL's generic musings about "patent accumulation" is equally off base, because the AC is about the misuse of fraudulent patents as part of UPL's monopolization scheme.

### 2. Abusive use of patents

[15] The AC at ¶ 189 also alleges UPL threatened infringement against other competitors, another enforcement act. *See Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1350 (Fed. Cir. 2007).

It also is anticompetitive for a dominant firm to extend the scope of patents—whether or not fraudulently procured—because doing so excludes competition. *See Morton Salt Co. v. GS Suppiger Co.*, 314 U.S. 488, 491 (1942) (explaining patents may not be used to "restrain competition in the marketing of unpatented articles"). This means it is anticompetitive to "condition the right" to use a patent on the purchase or use (or not purchasing or using) another product outside the patent scope. *See Zenith Radio Corp. v. Hazeltine Rsch, Inc.*, 395 U.S. 100, 136 (1969).

UPL leveraged its patents as part of its monopolizing campaign. AC ¶¶ 190-96. UPL repeatedly conditioned licenses for the '727 patent product (MF Combination) on purchases of unpatented MF Dithiocarbamates (mancozeb) from UPL, *id.* ¶¶ 14, 25-30—a clear-cut improper extension of the patent's scope. UPL has done this to strengthen its power in both relevant markets, through excluding competitors in MF Combinations by blocking their ability to supply the product (and end-users to use it), absent UPL's improper license, *id.* ¶¶ 33-38, 194-96, 209-11, and through restraining competition in MF Dithiocarbamates by coercing competitors to purchase UPL's more expensive and lesser quality mancozeb. *Id.* ¶¶ 17, 31, 190-93, 204-07.[16] This leveraging of patents is not competition on the merits. *See, e.g., In re Keurig Green Mtn. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 233-34 (S.D.N.Y. 2019) (ruling alleged leveraging of patents is anticompetitive rather than competition on merit).

UPL's entire argument about "tying" ***generally*** misses the mark. OB at 25-27, because the allegations are about UPL's misuse of ***patents*** specifically, and courts uniformly condemn the use of patents to condition or tie unpatented products. *E.g., Morton Salt*, 314 U.S. at 492 (explaining

[16] While Syngenta has withstood UPL's coercion so far, Syngenta and competition generally have been harmed from loss of a lawfully competing supplier in a concentrated market. AC ¶¶ 17, 147, 204-06.

patent grants are "special privilege" which cannot be used to pursue monopolies). For the same reason, UPL's non-patent cases are inapt. OB at 25-26. The argument that Syngenta has alternative suppliers of unpatented mancozeb, *id.* at 26, similarly dodges the import of the allegations—that UPL has anticompetitively used patents as leverage. AC ¶¶ 190-95.

The ballyhooed right to refuse to deal is equally off-mark, OB at 25, because so such "right" exists for a monopolizing scheme alleged here. *See United States v. Colgate & Co*., 250 U.S. 300, 307 (1919) (explaining "right" exists only "***[i]n the absence of any purpose to create or maintain a monopoly***"); *Duke Energy*, 111 F.4th at 366 (explaining no "right to deal" for conduct "part of a larger scheme"). UPL's absurd assertion that competitors could just accept UPL's unreasonable terms or make their own active ingredients, OB at 25-26, is roundly rejected by courts as both improperly excusing monopolizing conduct and burdening targets of that conduct. *See PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) (explaining plaintiffs need not choose between restrictive terms or product access, because that "dilemma" is what "the Sherman Act is designed to prevent").[17]

**3. Campaign of baseless and sham patent proceedings**

Using litigation or government proceedings to damage or destroy competition is anticompetitive, when they are baseless or a "sham" disguising efforts to interfere with business of a competitor. *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).

The AC alleges a campaign of baseless or sham proceedings designed to interfere with competition. This includes UPL's misuse of fraudulently procured patents to exclude competition

[17] *See also Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 217 (S.D.N.Y. 2014) (antitrust plaintiff need not accept "functionally unavailable" product to avoid restraint); *Chi. Pro. Sports v. NBA*, 754 F. Supp. 1336, 1354 (N.D. Ill. 1991) (pointing out logic "holes" in argument like UPL's, where injury arises from anticompetitive act and plaintiff had no obligation to "sidestep[]" injury).

in MF Combination market, AC ¶¶ 18-21, 165-89, through years of fraudulent representations to the PTO and PTAB that extended costly challenges of UPL's patents, *id*. ¶¶ 65-77, 79, 17, and UPL's prosecution of appeals. *Id*. ¶¶ 172. This prolonging and multiplying proceedings involving fraudulently procured patents is inherently baseless and anticompetitive. *See Cal. Motor*, 404 U.S. at 512-13 (confirming proceedings using fraudulent patents to exclude competitors is anticompetitive). Beyond the United States, UPL's campaign includes multiple baseless patent suits in Brazil against a competitor (Adama) to coerce purchases of UPL's primary product (mancozeb) to increase its power in MF Dithiocarbamates market. *Id*. ¶¶ 179-80, 182, 186. These allegations plausibly state a campaign of baseless or sham proceedings that, viewed wholistically, harm competition in both relevant markets. *See, e.g.*, *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc*., 164 F. Supp. 3d 1117, 1133-34 (D. Minn. 2016) (alleged threatened enforcement of fraudulent patent stated anticompetitive conduct).[18]

Name-dropping *Noerr-Pennington* cannot help UPL, OB at 23, because any such immunity is stripped due to fraud as alleged. *See Walker Process*, 382 U.S. at 177. In any event, whether challenged proceedings are baseless or within *Noerr-Pennington*, "is a question of fact that is inappropriate for a motion to dismiss." *The Scooter Store*, 777 F. Supp. 2d at 1115 (cite omitted).

UPL's heavy reliance on Syngenta "initiating," or UPL "responding" to, patent reviews, OB at 22-23, conveniently ignored baseless litigations UPL ***initiated***. AC ¶¶ 179-82. UPL also erroneously presumes responders cannot act anticompetitively, thereby ignoring its prolonging of

[18] *See also In re Loestrin 24 Fe Antitrust Litig*., 261 F. Supp. 3d 307, 348-49 (D.R.I. 2017) (ruling lawsuit to enforce allegedly fraudulent patent is an "anticompetitive weapon"); *The Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1115-16 (S.D. Ohio, 2011) (allegations of litigation to enforce fraudulent trademark was anticompetitive); *In re Neurontin Antitrust Litig*., No. 02-1830 (FSH), 2009 WL 2751029, at *18-20 (D.N.J. Aug. 28, 2009) (alleged manipulation of PTO processes to delay patent to foreclose competitor stated anticompetitive conduct).

proceedings by concealing fraud, forcing competitors to do years of costly field trials and expensive discovery, followed by UPL offensively prosecuting appeals to extend its monopoly period. *Id.* ¶¶ 74-75, 79, 172-74. These tactics by fraudulent patentholders, responding or not, are anticompetitive. *See, e.g., Neurontin Antitrust Litig.*, 2009 WL 2751029, at *18-20 (using gamesmanship to delay proceedings can be anticompetitive). UPL's initiator-only theory is not supported by its cases.[19] If credited, it would immunize abusers of patents, as long as they coerce victims to file first. Such perverse incentives and unfair results would offend the Sherman Act. *See Walker Process*, 382 U.S. at 180 ("antitrust remedies should be allowed room for full play" for fraudulent patents) (Harlan, J. concurring).

The cynical argument that proceedings cannot be baseless or sham until UPL's fraud is finally adjudicated, OB at 23-24, is contrary to the AC's allegations that UPL knowingly deceived the PTO to procure patents. AC ¶¶ 65-77. Consequently, UPL's defense of those patents has always been objectively baseless. *See FTC v. Cephalon, Inc.*, 36 F. Supp. 3d 527, 534 (E.D. Pa. 2014) ("one who acted fraudulently in obtaining a patent necessarily knows its patent is unenforceable") (cite omitted). UPL also erroneously assumes there is a defense for such fraud, *see Walker Process*, 382 U.S. at 177, contrary to "common sense and basic fairness." *Cephalon*, 36 F. Supp. 3d at 535 (ruling defendant that fraudulently procured patent could not assert "defense uncertainty" to avoid anticompetitive consequences). These extreme arguments fail to make the AC implausible.

#### 4. Coercive threats/disparagement

---

[19] None of UPL's cases turned on who initiated proceedings. *FMC Corp. v. Manitowoc Co.* unremarkably says ***properly*** procured and enforced patents do not violate antitrust law. 835 F.2d 1411, 1418, n.16 (Fed. Cir. 1987). UPL cut out the key part of *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha's* explanation that a reasonable license offer, ***without more***, would not result in reasonable apprehension of suit. 57 F.3d 1051, 1053 (Fed. Cir. 1995). And *Shell Oil Co. v. Amoco Corp.* considered whether apprehension was reasonable when, unlike here, the patentee ***never*** said its patent was infringed or threatened enforcement. 970 F.2d 885, 889 (Fed. Cir. 1992).

As part of UPL's use of patents to monopolize, the AC alleges that UPL threatened potential MF Combination competitors with patent proceedings, AC ¶¶ 187-89, which is anticompetitive because UPL held no legitimate patents covering the product. *See Morton Salt*, 314 U.S. at 491-92 (explaining it is anticompetitive to claim rights in excess of patent). The AC also alleges that UPL similarly threatened customers, AC ¶ 189, which is anticompetitive for the same reason. *See M & M Med.*, 981 F.2d at 168 (affirming firm "pressuring," threatening, and misleading customers to block competitor is anticompetitive). And the AC alleges UPL disparaged Syngenta and its products, by falsely telling customers that its products infringe UPL patents, AC ¶ 189, which, in combination with UPL's other conduct, is anticompetitive. *See, e.g., Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 786-88 (6th Cir. 2002) (affirming deceptive, disparaging statements about competitor, and similar conduct, are anticompetitive); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 455 (6th Cir. 2011) (similar).

UPL's criticism of these specific allegations, improperly parsed in isolation, is not grounds for dismissing entire claims. OB at 27. While some allegations are "information and belief," that does not negate their plausibility. *See Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D Va. 2015). Also, Rule 8 does not require names of all third parties the AC references. *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). Disputing the factual accuracy of allegations—like UPL arguing it could not disparage Syngenta's product because the '727 patent is not fraudulent—is impermissible at this stage.

**5. Acquisition of large competitor assets**

A dominant firm's acquisition of a competitor "is properly classified as anticompetitive, for it tends to augment or reinforce the monopoly by means other than competition on the merits." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 53 (D.D.C. 2022) (cite omitted).

That is precisely what the AC alleges: UPL willfully reinforced its MF Dithiocarbamates

dominance by acquiring the mancozeb business, IP, and brands of its main competitor, Corteva. AC ¶¶ 197-99. Doing so, UPL admitted before this case, "strengthen[s]" and "cements" its dominance. *Id.* ¶¶ 198-200. The alleged consequential lessening of competition in an already concentrated market, *id.* ¶¶ 147-48, protected by big barriers, *id.* ¶ 154-60¶, is plausibly anticompetitive—especially in the United States where Corteva was UPL's largest competing producer. *Id.* ¶¶ 197, 200.[20] Even partial acquisitions of less significant businesses can be anticompetitive. *See, e.g., Carefirst of Md., Inc. v. J & J*, 745 F. Supp. 3d 288, 316 (E.D. Va. 2024) (ruling alleged dominant firm's acquisition of competitor's intellectual property can be anticompetitive); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 622 (W.D. La. 2016) (denying motion to dismiss alleged anticompetitive acquisitions because they "alone may establish the anticompetitive conduct element of a section 2 claim").

Conclusory arguments by UPL are easily dispatched. OB at 28. Its assertion that the AC "pleads no facts" is incorrect. The claim that UPL's Corteva acquisition cannot affect an "entire market" is inappropriate counsel speculation. *See Kolon Indus.*, 637 F.3d at 449-50 (ruling district court wrongly credited defense counsel's assertions on market impact). It also is contrary to allegations that Corteva was among the largest worldwide producers of mancozeb (representing vast majority of MF Dithiocarbamates), and UPL's acquisition of Corteva's worldwide mancozeb business[21] lessened competition, reduced customer choice, and further enabled UPL to increase prices. AC ¶¶ 101, 147, 149-50, 197-200. UPL's assertion also is flawed for considering the acquisition in isolation, ignoring the effects of its other challenged conduct. *See Duke Energy*, 111 F.4th at 354-55. UPL's misleading *Bio-Rad* quote is inconsequential; it involved a ***non-dominant***

[20] Illustrating competitive lessening, Syngenta had purchased mancozeb from Corteva. AC ¶ 17.

[21] Corteva's business in a few countries was not acquired, AC ¶ 197, but this does not affect the anticompetitive lessening of competition worldwide or in the United States or Brazil.

firm (unlike UPL). *Bio-Rad Lab'ys., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 66 (D. Mass. 2020) (acquisition by non-dominant firm may not be anticompetitive absent other conduct).

#### 6. Using exclusive/restrictive contracting tactics

Anticompetitive conduct comes in "myriad" forms that "cannot always be categorized," and some of them "may overlap." *Duke Energy*, 111 F.4th at 354-55 (cites omitted). The AC so alleges that UPL leveraged its patents and market control to pursue restrictive contractual terms to bolster its control of MF Dithiocarbamates. AC ¶¶ 190-94, 201-02.

Contrary to UPL's claim that no contracting tactics are identified, OB at 26, the AC describes UPL's tactics in pursuit of contracts with exclusive or near exclusive mancozeb purchase requirements for Syngenta, AC ¶¶ 25-30, for Adama, *id*. ¶ 182, and for others upon belief. *Id*. ¶¶ 184, 194. Also, criticizing the AC for not alleging how UPL's tactics were "beyond common practice" mistakenly presumes that plaintiffs must allege away valid business reasons for challenged defendant conduct. *See Simon and Simon, PC v. Align Tech., Inc*., 533 F. Supp. 3d 904, 914-16 (N.D. Cal. 2021) ("That can't be right"). UPL's critique also disregards its alleged unlawful leveraging of patents to get the challenged contractual terms, *see supra*, Section III.D.2., and pretends the AC does not allege prices reflecting "anticompetitive" conduct. AC ¶¶ 150, 206-07 (alleging anticompetitive pricing). Moreover, UPL's myopic focus on contracting tactics or prices improperly compartmentalizes its whole conduct. *See Duke Energy*, 111 F.4th at 354-55. While Syngenta need only allege an act to support its monopoly claims, the AC alleges a broad course of conduct that is plausibly anticompetitive whether viewed wholistically or in pieces.

### E. Syngenta Alleges Plausible Standing To Sue For Antitrust Damages

Antitrust standing merely confirms that claimed "loss 'reflect[s] the anticompetitive effect'" of challenged conduct. *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021) (cite omitted). Courts routinely find this injury to plaintiffs, like Syngenta here, operating

in markets subjected to anticompetitive acts. *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007) (saying restraint in plaintiff's market "is plainly an injury").

UPL's anticompetitive conduct has allegedly reduced competition and customer options, inflated prices for MF Dithiocarbamates, excluded competitors in MF Combination market, and others effects. AC¶¶ 203-10. Each is well recognized antitrust injury. *E.g., Novell*, 505 F.3d at 315-16 (thwarted competitor entry); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (inflated prices); *In re Cardizem CD Antitrust Litig*., 332 F.3d 896, 910 (6th Cir. 2003) (reduced consumer options). This suffices as the AC need only "general factual allegations" of injury. *Oxbow Carbon & Minerals LLC v. Union Pac. R.R*., 81 F. Supp. 3d 1, 7 (D.D.C. 2015).

UPL stridently declares no antitrust standing, OB at 19-21, but fails to back it up. UPL's singular focus on Syngenta's "preparedness" to enter U.S. MF Combination market, OB at 19, ignores all other independently sufficient injuries and standing. UPL also ignores the AC's allegations of Syngenta's preparedness at ¶¶ 2, 34, 37-39, 210-11 that resemble allegations UPL's own case held sufficient. *See BNLfood Invs. Ltd. SARL v. Martek Bio. Corp.*, No. 1:11-cv-00446, 2011 WL 6439451, at *4 (D. Md. Dec. 14, 2011) (alleged experience, financial capability, and customer connections pled "preparedness"). The notion that Syngenta needs ***customer contracts*** as a prerequisite to standing, OB at 20, would, if endorsed, shield firms that fully succeed at excluding competitors. UPL's supposition that Syngenta's harm was caused by some unidentified business decisions, *id*., and not due to UPL as plausibly alleged, AC ¶¶ 203-11, is more improper alternative "fact" that is not grounds for Rule 12(b)(6) dismissal.

## CONCLUSION

UPL's Motion to Dismiss should be denied in all respects for all the foregoing reasons. Alternatively, if the Court grants any portion of UPL's motion, it should do so without prejudice and with leave to amend in the interest of justice.

Dated: January 16, 2026

*/s/ Charles C. Carson*

Toni-Junell Herbert, Esq.*
Charles C. Carson, Esq. (VA Bar 48164)
Danyll W. Foix, Esq.*
David M. Klecyngier, Esq.*
Daniel P.M. Wicklund, Esq.*
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC 20036
Tel: 202.861.1500
Fax: 202.861.1783
Email: THerbert@bakerlaw.com
CCarson@bakerlaw.com
DFoix@bakerlaw.com
DKlecyngier@bakerlaw.com
DWicklund@bakerlaw.com

Leif R. Sigmond, Jr., Esq.*
Jennifer M. Kurcz, Esq.*
BAKER & HOSTETLER LLP
1 Wacker Drive, Suite 3700
Chicago, IL 60606
Tel: 312.416.6200
Email: LSigmond@bakerlaw.com
JKurcz@bakerlaw.com

* *Admitted pro hac vice*

*Counsel for Plaintiff Syngenta Crop Protection AG*